KEVIN P. DIXON, deceased, by and
through LULA M. DIXON, his mother,
next best Friend and Independent
Administrator of the Estate of Kevin P.
Dixon,

        Plaintiffs,

        v.

COOK COUNTY d/b/a CERMAK HEALTH
SERVICES, COOK COUNTY DEPARTMENT
OF CORRECTIONS, OFFICER LANIEKA
DAVIS, SERGEANT LEROY KELLY, OFFICER
BRENDAN KELLY, SERGEANT LEON
MARMOL, PARAMEDIC LOGGIN, CERTAIN
UNKNOWN PARAMEDICS, CERTAIN
UNKNOWN EMPLOYEES/AGENTS OF COOK
COUNTY DEPARTMENT OF CORRECTIONS
and CERTAIN UNKNOWN
EMPLOYEES/AGENTS OF COOK COUNTY
d/b/a CERMAK HEALTH SERVICES,

        Defendants.

No. 09 C 6976

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Lula Dixon ("Plaintiff") filed a complaint on behalf of her son Kevin Dixon,

deceased ("Dixon"), alleging that Cook County, doing business through its prison

medical services provider Cermak Health Services (the "County"), and corrections

officers Officer Lanieka Davis, Sergeant Leroy Kelly, Officer Brendan Kelly,

Sergeant Leon Marmol (the "Officers"), violated the Eighth Amendment and state

law by being deliberately indifferent to Dixon's medical needs while he was

incarcerated in the Cook County Jail pending trial. R. 49-1. The County, R. 106, and the Officers, R. 119, have separately moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, both motions are granted and Dixon's complaint is dismissed.

## Background

At the time Dixon entered the Cook County Department of Corrections as a pre-trial detainee on September 5, 2008, he was in apparent good health. R. 120 ¶ 5; R. 126 ¶ 5. But in October 2008, Dixon began to experience increasingly severe pain in his back and abdomen. R. 120 ¶ 6; R. 126 ¶ 6. On November 8, 2008, Dixon submitted a medical request form complaining of pain in his stomach, back, and heart. He was treated by a physician on November 12, 2008, and diagnosed with gastroesophageal reflux disease. R. 120 ¶ 10; R. 126 ¶ 10. Dixon saw another "medical professional" on November 28, 2008, who concluded that Dixon was experiencing psychosomatic pain. R. 120 ¶ 11; R. 126 ¶ 11.

Dixon had a chest x-ray on December 10, and based on the results, a CT scan was ordered for Dixon. R. 108 ¶ 9; R. 130 ¶ 9. The CT scans that Dixon underwent on December 11 revealed that he had a large mass in the left paratracheal region of his chest, a little larger than five by five centimeters. R. 167 ¶ 5; R. 129-15. Based on the CT scan results, Dixon was scheduled for an "urgent" pulmonary consultation, which he received on December 23. R. 129-16. He was then scheduled to have a follow-up visit with the pulmonologist and to undergo another CT scan on January 2, 2009. R. 108 ¶ 10; R. 130 ¶ 10.

Edward Floyd was Dixon's cellmate during the relevant time period. Floyd testified that Dixon collapsed to the floor the night of December 29-30 and urinated on himself. R. 120-11 (Floyd's Deposition Transcript) at 34-36.

Officer Davis began her shift at 7 a.m. on December 30. R. 167 ¶ 15. Officer Davis checks on each cell at the start of her shift to make sure the inmates "are alive." *Id.* ¶ 15. Floyd says that when Officer Davis checked on their cell at the beginning of her shift, he told her that Dixon had collapsed and could not move, and he asked her to bring them a mop. R. 120-11 at 38-40. Floyd says that Officer Davis did not believe him and did not provide a mop. *Id.*

Officer Davis completed an "Inmate Medical Service Request" form stating that she notified Sergeant Kelly (her supervisor) at 9:40 a.m., Paramedic Loggin at 9:44 a.m., and Nurse Omeke at 11:09 a.m. that Dixon had pain in his stomach and legs, was not able to use the bathroom, and could not get up. R. 128-9. The form also noted that Dixon would be put on "sick call for Friday," which was three days later, and that Dixon was not "treated on site," "transported to the dispensary," nor "transported to Cermak." *Id.* Floyd testified, however, that no medical personnel came to the cell to attend to Dixon that morning and that Dixon remained lying on the floor in his urine. R. 120-11 at 39-40.

Officer Kelly and Sergeant Marmol came on duty at 3:00 p.m. that afternoon. R. 167 ¶ 23. When Officer Kelly started his shift, he found Dixon lying on the floor of his cell. R. 120 ¶ 23; R. 126 ¶ 23. Either Dixon or Floyd told Kelly that Dixon was in pain and could not stand. R. 120 ¶ 22; R. 126 ¶ 22. By 5:00 p.m., Officer Kelly had

reported Dixon's condition to Sergeant Marmol (Officer Kelly's supervisor), and medical staff from Cermak arrived at approximately 5:15 p.m. R. 120 ¶ 24; R. 126 ¶ 24.

According to Floyd, when the paramedics from Cermak arrived, they stated that nothing was wrong with Dixon's legs and he should be able to walk. R. 120-11 at 41-42. The paramedics told Dixon he had to get down the stairs by himself, so he started dragging himself across the floor with his arms. *Id.* at 43. When Dixon could not drag himself any further, Officer Kelly and another person dragged Dixon down the stairs. *Id.* at 44-46.

Rufus Balentine, an inmate in a nearby cell, testified that he heard the guards curse at and kick Dixon. R. 120-6 at 89. Balentine said Dixon complained that he was in pain, but the guards were laughing and joking. R. 120-5 at 43.

Dixon arrived at Cermak's emergency room at 6:00 p.m., and had a CT scan of his back at 6:29 p.m. R. 120 ¶ 28; R. 126 ¶ 28. Physician's Assistant Glen Trammel examined Dixon and noted that despite Dixon's claims of paralysis, Dixon was able to lift his legs to remove his socks and hold his legs in the air during a range of motion exam. R. 108 ¶ 14; R. 130 ¶ 14. Based on the inconsistency between Dixon's claimed paralysis and Trammell's observation that Dixon used his legs, Trammell ordered a psychiatric consultation to rule out the possibility that Plaintiff was malingering or faking his paralysis. R. 108 ¶ 15; R. 130 ¶ 15. He also ordered a CT scan of the thoracic, lumbar, and sacral regions of Dixon's spine and an obstructive series of Dixon's abdomen to ensure that there was no obstruction

causing constipation. This series showed no such obstruction. R. 108 ¶ 15; R. 130 ¶ 15.

The next day, Dixon was transferred to the infirmary at Cermak. R. 120 ¶ 29; R. 126 ¶ 29. Dr. Katina Bonaparte examined Dixon around 10:00 a.m. R. 108 ¶ 19; R. 130 ¶ 19. At her deposition, Dr. Bonaparte testified that the only report in Dixon's electronic records was a normal chest x-ray from September 2008. R. 146 ¶ 2. She also testified that she was aware that Dixon had a mass in his chest, and that he had a consult with a pulmonologist on December 23. R. 129-2 (Bonaparte Deposition Transcript) at 145-48; 177-78. A "Consultation Request Form" that Dr. Bonaparte completed on December 31 notes that Dixon's December 11 CT scan showed a "paratracheal mass." R. 108-8 at 3. Dr. Bonaparte has since submitted a declaration re-asserting that she was aware that radiology had discovered a mass located in Dixon's left paratracheal region and that he had already consulted with a pulmonologist in December. R. 108-8.[1] The parties agree that Dr. Bonaparte requested another pulmonologist consult for Dixon on a "rush" basis. R. 108 ¶ 22; R. 130 ¶ 22.

---

[1] In her declaration, Dr. Bonaparte states, "While I was aware that radiology had discovered a mass located in Mr. Dixon's left paratracheal region, I also saw on the Cerner System, which is the electronic medical records system . . ., that Mr. Dixon had already consulted with a pulmonologist." R. 108-8 ¶ 4. Plaintiff objects that this statement "directly contradicts her prior deposition testimony that the only report in the CERNER system was [Dixon's] normal chest x-ray from September 2008." R. 130 ¶ 22. This inconsistency may be enough to show a dispute as to what information was contained in the electronic records system, but Dr. Bonaparte has consistently asserted, both at her deposition and in her declaration, that she was aware at the time she examined Dixon that he suffered from a mass in his chest and had a pulmonologist consultation on December 23.

On January 2, 2009 at 10:33 a.m., radiologist Calvin Flowers read the CT scan Dixon had on December 30 and observed a "significant amount of fecal matter throughout the entire colon and a large left paraspinal and paramediastinal mass in the left chest." R. 146 ¶ 5.[2] Dr. Bonaparte testified that she does not remember if she made any effort to learn the results of the CT scan. *Id.* ¶ 7. Dr. Bonaparte prescribed a powerful laxative and over-the-counter pain relievers and discharged Dixon back to the Cook County Jail at 12:30 p.m. on January 2, 2009. R. 108 ¶¶ 23, 26; R. 130 ¶¶ 23, 26.

Before being discharged, Dixon had another CT scan on January 2, 2009. R. 146 ¶ 13. The scan report was verified by radiologist Michael Apushkin at 3:48 p.m. on January 2, after Dixon had been discharged. *Id.* The report described the mass in Dixon's body as a "6 x 4 centimeters . . . [and] indicative of a malignant neoplasm." *Id.*

On January 5, 2009, Dixon was again brought to the Cermak emergency room. He was examined by Dr. Pedro Cruz. R. 146 ¶ 19. Dr. Cruz diagnosed Dixon with paraplegia and bowel and bladder incontinence, a large left paramediastinal mass, and a Stage II sacral pressure sore on his right buttock. *Id.* ¶ 22. Dr. Cruz made the decision to transfer Dixon to Stroger Hospital because the lower part of Dixon's body was paralyzed. *Id.*

---

[2] The results of the CT scan performed on December 31 were not available until January 8. R. 129-8.

Doctors at Stroger Hospital determined that Dixon was paralyzed because of metastasized lung cancer. Dixon died from lung cancer on March 4, 2009. R. 120 ¶ 30; R. 126 ¶ 30.

Dr. Cruz testified that when he was a physician at Cermak in 2008 and 2009, there were circumstances when he examined a patient and did not have access to the patient's prior medical records because they had not yet been scanned into the computer system utilized by the jail's healthcare providers. R. 146 ¶ 23. In Dr. Cruz's experience, there were occasions when there was a lack of communication between the attending physicians at Cermak and the outside doctors who did consultations. *Id.* ¶ 24. Dr. Cruz also testified that an "urgent" consultation request should be fulfilled within 24 to 48 hours. R. 108-12 at 61:15-21.

Plaintiff relies on the expert report of Dr. Robert Greifinger to argue that "the policies and practices within the Cook County Jail create barriers to coordination of care and treatment which resulted in deficient medical care for Mr. Dixon resulting in unnecessary pain and suffering and lack of palliative care." R. 129 ¶ 31. Dr. Greifinger found that the "dual paper and electronic medical record system used by Cermak at [Cook County Jail] contributed to poor continuity and coordination of care. . . . Although there were more than enough x-rays and CT scans performed [on Dixon], staff who ordered them did not seek the reports and did not respond to the deteriorating results on this diagnostic testing, even when the reports were available to physician staff in the [electronic] system." R. 129-3 ¶ 38.

Plaintiff also argues that the Court should consider a July 11, 2008 report from the Civil Rights Division of the Department of Justice that "put Defendant Cook County on notice that a 17 month investigation revealed severe deficiencies in the policies and procedures of the Cook County Jail regarding acute care, continuity of care, coordination of care, and the medical record keeping system that created barriers to [providing] timely and appropriate medical care to its detainees." R. 134 at 6.

The County submits the expert report and testimony of Dr. Marc F. Stern stating that the treatment Dixon received was appropriate. R. 108-14. Dr. Stern is a board certified internist specializing in correctional health care. In Dr. Stern's opinion, the Cermak staff "moved with appropriate—if not supranormal—speed in getting [Dixon] in the office of a pulmonologist following the report of an abnormal chest x-ray." *Id.* at 3. Dr. Stern is of the opinion that the pain management Dixon was prescribed was appropriate considering the observations by medical staff regarding Dixon's pain levels. *Id.* at 4-5. In Dr. Stern's opinion, the Cermak medical staff took Dixon's complaints and condition seriously, because despite "collecting clinical information . . . that was painting a picture for them of a patient who might not be as sick and weak as he said he was[,] [r]ather than simply discounting Mr. Dixon's symptoms and jumping to that conclusion, they sought the input of a mental health specialist to see if he concurred with their clinical skepticism." *Id.* at 9. According to Dr. Stern, Dr. Bonaparte's request for a "rush" pulmonologist consult did not require that the consult occur within fewer than seven days. *Id.* at 5-

6. Dr. Stern explained that "days or even short weeks are unlikely to affect the prognosis in a patient with [Dixon's] type of lung cancer." *Id.* at 3.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotation marks omitted). To establish a deliberate indifference claim premised upon inadequate medical treatment a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant

acted with a subjectively culpable state of mind. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). For a medical condition to satisfy the objective element, the condition must be "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The "condition need not be life-threatening to be serious," however; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). To satisfy the subjective element, the plaintiff must demonstrate that the defendant knew of a substantial risk of harm to the plaintiff and either acted or failed to act in disregard of that risk. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

In circumstances where a plaintiff eventually receives the necessary medical treatment, a "delay in the provision of medical treatment for painful conditions— even non-life-threatening conditions—can support a deliberate-indifference claim," as long as the plaintiff can "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (internal quotation marks omitted). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim . . . . that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

## A.    The Officers

### 1.    Deliberate Indifference

Plaintiff contends that Officer Davis and Sergeant Kelly were deliberately indifferent to Dixon's medical condition on December 30 because they did not ensure that he received medical attention during their shifts, which lasted from 7 a.m. to 3 p.m. The undisputed facts show that Officer Davis notified Sergeant Kelly at 9:40 a.m., and Paramedic Loggins at 9:45 a.m., that Dixon required medical attention. The undisputed facts also show that Officer Davis notified Nurse Omeke at 11:09 a.m. that Dixon required medical attention.[3] The Seventh Circuit has held that corrections officers are "entitled to rely on the professional judgment of medical prison officials," *Hayes*, 546 F.3d at 527, and a corrections officer's "failure to take further action once he had referred the matter to the medical providers can[not] be viewed as deliberate indifference." *Greeno*, 414 F.3d at 655-56. Like the defendants in *Hayes*, Officer Davis and Sergeant Kelly "at worst . . . may have been negligent in failing to investigate further after" notifying Paramedic Loggins and Nurse Omeke, "but negligence is not deliberate indifference." 546 F.3d at 527.

---

[3] Plaintiff relies on the Inmate Medical Service Request form that Officer Davis completed to assert that Dixon was not "treated on site," or "transported to the dispensary," or "transported to Cermak," during Officer Davis's shift. R. 127 at 7. But this form also shows that Officer Davis informed Sergeant Kelly, Paramedic Loggins and Nurse Omeke of Dixon's condition. Plaintiff cannot cherry-pick information from this form. Plaintiff's assertion that neither Paramedic Loggins nor Nurse Omeke ever actually examined Dixon, based on Floyd's testimony that no medical professional visited their cell before 5:15 p.m., does not contradict Officer Davis's testimony that she reported Dixon's condition to Sergeant Kelly, Paramedic Loggins and Nurse Omeke, as she recorded in the service request form.

Plaintiff's claim against Officer Davis and Sergeant Kelly also fails because their actions did not "unnecessarily prolong[] and exacerbate[] [Dixon's] pain," as Plaintiff contends. R. 127 at 12 (quoting *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)). The only delay for which Officer Davis or Sergeant Kelly could possibly be responsible is the three to four hour delay from the time Officer Davis notified Nurse Omeke that Dixon required medical attention until 3:00 p.m. when Officer Davis's and Sergeant Kelly's shifts ended. The cases Plaintiff cites that involved delays in treatment which courts found could support a deliberate indifference claim all involved delays of much greater length, or pain that was much more emergent than Dixon's. In *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008), the plaintiff waited a day and half for treatment of a broken nose. In *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), the plaintiff waited two days for treatment of a dislocated finger. And in *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010), the plaintiff waited two months for treatment of a severe toothache. Dixon's case is much more like *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995), and *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009), where the *Murphy* plaintiff's two-hour wait for treatment of a broken hand, and the *Knight* plaintiff's two and half-hour wait for treatment of a torn rotator cuff, did not "unnecessarily prolong" either plaintiff's pain.

Although Plaintiff relies heavily on the seven hour delay in treatment of a plaintiff's heart attack symptoms in *Williams v. Liefer*, that case is distinguishable because the court held that the plaintiff had proffered "verifying medical evidence"

that the delay exacerbated his condition. 491 F.3d at 716-17. The plaintiff was able to show that the medication he was eventually given quickly alleviated his pain and significantly decreased his blood pressure. *Id.* The court held that a jury could find that "six extra hours of pain and dangerously elevated blood pressure for no good reason" could constitute deliberate indifference. *Id.*

By contrast, Plaintiff has proffered no such evidence here. A cancerous mass is obviously a very serious condition, and the Court accepts that Dixon was experiencing pain and that the mass was making it difficult for Dixon to use his legs, if not causing him out-right paralysis for at least certain periods of time. But there is no evidence in the record that the delay at issue caused or exacerbated these conditions. Plaintiff has not even alleged that once Dixon was taken to the hospital that his pain was significantly alleviated. If the medical attention Dixon eventually received did not materially ameliorate his condition, then absent evidence to the contrary, the Court cannot hold that a reasonable juror could find that a delay of several hours in receiving that medical attention exacerbated Dixon's condition.

With regard to Officer Kelly and Sergeant Marmol, it is undisputed that their shifts began at 3:00 p.m. and that Officer Kelly reported Dixon's condition to Sergeant Marmol by approximately 5:00 p.m., and paramedics arrived at Dixon's cell around 5:15 p.m. For the same reasons the Court discussed above, this two-hour

delay in medical treatment cannot support a claim of deliberate indifference against Office Kelly or Sergeant Marmol.[4]

## 2. Qualified Immunity

Moreover, even if the Officers' conduct violated Dixon's Eighth Amendment rights, they are entitled to qualified immunity. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). A "plaintiff seeking to defeat a defense of qualified immunity must establish two things: first, that she has alleged a deprivation of a constitutional right; and second, that the right in question was 'clearly established.'" *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "In undertaking this analysis . . . . [i]t is not enough . . . to say that it is clearly established that those operating detention facilities must not engage in cruel or unusual punishment." *Miller*, 698 F.3d at 962. "The way that the right is translated into the particular setting makes a difference." *Id.* "The plaintiff must show that the contours of the right are

_____

[4] Balentine, an inmate in a cell near Dixon's, testified that he "heard" the guards or paramedics kick Dixon. Absent additional evidence that Dixon was actually kicked and of who kicked him, Balentine's testimony that he heard rather than saw Dixon be kicked is insufficient to support a claim of deliberate indifference against any of the Officers. Moreover, Plaintiff alleges that Officers acted with deliberate indifference, not excessive force.

'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Even if the Eighth Amendment required the Officers to have ensured that Dixon received medical attention more quickly than they did, it was not unreasonable for the Officers to believe that they were acting in compliance with Dixon's rights. Officer Davis contacted Paramedic Loggins just over two hours after she learned that Dixon required medical attention. Her supervisor, Sergeant Kelly, instructed Officer Davis to contact medical professionals, and she did so. While it may have been preferable for Officer Davis and Sergeant Kelly to check whether Dixon had received the medical attention he required before they completed their shifts at 3:00 p.m., it was not unreasonable for them to assume that Paramedic Loggins or Nurse Omeke had appropriately handled the situation. This analysis holds true as well for the even shorter delay in treatment Plaintiff has alleged Officer Kelly and Sergeant Marmol caused.

### 3.     Intentional Infliction of Emotional Distress

Plaintiff also alleges that the Officers' intentionally inflicted emotional distress on Dixon in violation of Illinois law. Under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/4-105, public employees like the Officers are not "liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody," unless the employee "knows . . . that the prisoner is need of immediate medical care and, through willful and wanton conduct, fails to [act]." The parties

agree that the "'willful and wanton standard is remarkably similar to the deliberate indifference standard.'" R. 121 at 12 (quoting *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007)); R. 127 at 18-19. Consequently, a holding that public employees did not act with deliberate indifference "is dispositive of" whether their conduct was willful and wanton. *Williams*, 509 F.3d at 405. Therefore, Plaintiff's intentional infliction of emotional distress claim is dismissed because the Court has held that the Officers did not act with deliberate indifference.

## B.    The County

Plaintiff also alleges that the County is liable for providing deficient medical care to Dixon because the County failed to correct "severe lapses in the practices and procedures . . . that created barriers to the continuity and coordination of necessary medical care for Mr. Dixon's serious medical condition." R. 134 at 8-9.

Although "a municipality cannot be held liable under § 1983 on a respondeat superior theory," "municipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690-91 (1978); *accord Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). "A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "To demonstrate that the County is liable

for a harmful custom or practice, the plaintiff must show that County policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Id.* (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. Moreover, for a municipality to be liable, the causal relationship between the policy or practice and the harm must be such that the policy was the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989); *accord Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).

The County argues that summary judgment is appropriate here because "Plaintiff cannot establish that [Dixon] suffered a constitutional injury," or "that a widespread practice existed causing his alleged injury." R. 107 at 3-4. Plaintiff argues that Dixon was harmed by the County's "lack of timely care for a serious medical need," "lack of communication and coordination of care between providers," and "dysfunctional medical record keeping procedures." R. 134 at 17-18.

As the Court discussed previously, a constitutional injury requires both an objectively serious risk of harm and that the defendant acted with a subjectively culpable state of mind. *Roe*, 631 F.3d at 857. Regarding the "risk of harm," it is undisputed that Dixon was examined or treated by medical professionals on November 12 and 28, December 10-12 and 23, and December 30-Jaunary 2. Dixon had a CT scan on December 11 and based on the results of that scan, Dixon was

examined by a pulmonologist on December 23. Dixon then had CT scans on December 30 and 31, and January 2.

Plaintiff contends that this course of treatment from November until Dixon's discharge on January 2 was untimely and that the medical professionals involved did not follow through on treatment instructions—specifically, they waited 11 days to provide a pulmonologist consultation that was ordered as "urgent." But Plaintiff has not cited any fact or expert testimony tending to show that Dixon's 11 day wait for a pulmonologist consultation was the result of anything but a scheduling decision by the medical professionals involved. Plaintiff has offered no evidence to suggest that any deficiencies in County policies or practices prevented Dixon from receiving the consultation sooner. Dr. Cruz's testimony that Dixon should have received this consultation sooner because the referral was marked "urgent" is evidence that the medical professionals involved did not follow the policy or practice that was in place, not that the County's policy or practice was substandard. That there was a mechanism in place to allow for referrals to be marked "urgent" points to the fact that policies at least existed that allowed for an expedited referral process to take place.

Plaintiff also relies on the report of Dr. Greifinger to argue that "the policies and practices within the Cook County Jail create barriers to coordination of care and treatment which resulted in deficient medical care for Mr. Dixon resulting in unnecessary pain and suffering and lack of palliative care." R. 129 ¶ 31. The Court has already held, however, that Dr. Greifinger's opinion that the County's response

time was substandard is not reliable because Dr. Greifinger "fails to articulate what the appropriate standard of care is." R. 101 at 9. But, in any event, Dr. Greifinger's opinion that Dixon's care should have been expedited is not evidence that any deficiency in County policy *caused* Dixon's care to occur in the time frame which it did. Therefore, the Court holds that a reasonable juror could not find that Dixon's history of medical treatment leading up to his discharge on January 2 could constitute deliberate indifference to Dixon's medical condition.

Beyond the course of treatment that Dixon received until his discharge on January 2, Plaintiff also alleges that Dixon was harmed by the three day delay in providing Dixon with appropriate care for his cancer between January 2, when he was discharged from Cermak, and January 5 when he was transferred back to Cermak. Plaintiff asserts that Dr. Bonaparte did not have access to Dixon's complete medical records while he was at Cermak, and that the medical professionals at Cermak did not adequately communicate with each other. Plaintiff contends that if Bonaparte had access to Dixon's medical records, specifically Dixon's CT scan from December 11-12, she would not have discharged him on January 2. and that because Dixon was discharged on January 2 he "suffered needlessly, received no palliative care for his cancer and developed painful stage II pressure ulcers on his buttocks." R. 134 at 13.

Although the County concedes that Dixon's "lung mass [was] a serious medical condition," R. 107 at 6, the mere existence of the lung mass is not the harm at issue here. Rather it was the three day delay in receiving palliative care for

Dixon's quickly deteriorating condition that is the harm at issue here. The Court finds that this three day delay in receiving palliative care unnecessarily prolonged Dixon's suffering. See *Grieveson*, 538 F.3d at 779.

Plaintiff, however, cannot show that any policy failure on the part of the County was the moving force behind the harm Dixon suffered. Plaintiff has no evidence to contradict Dr. Bonaparte's assertion that she was aware that Dixon had a mass in his chest area. And despite this knowledge, Dr. Bonaparte was not convinced that this mass was causing Dixon's symptoms and determined that it was appropriate to discharge Dixon based on her examinations of Dixon and reports from nurses at Cermak. Moreover, the pulmonologist who examined Dixon on December 23 had reviewed the results of the CT scan from December 11 and determined that Dixon could return to the jail. Plaintiff has not provided any evidence to conclude that had Dr. Bonaparte reviewed the December 11 CT scan she would have reached a conclusion different from the pulmonologist. In fact, she requested another pulmonologist consultation for Dixon, indicating that she thought a pulmonologist's expertise was again necessary to access Dixon's condition.

Additionally, Plaintiff has not alleged that any deficiency in County policy prevented Dr. Bonaparte from accessing Dixon's December 11 or December 30 CT scans if she had determined she needed to review them. Thus, despite Plaintiff's allegation that Dr. Bonaparte's decision would have been different had she had Dixon's complete medical records, Dr. Bonaparte was not *deprived* of access to any pertinent information that was available at the time of Dixon's discharge. Rather,

had Dr. Bonaparte felt she needed to review any of Dixon's CT scans she could have retrieved that information. It was Dr. Bonaparte's determination, however, that she did not need this information. Accordingly, even assuming that the County did not maintain a policy or practice sufficient to ensure that doctors had their patients' complete medical records and communicated with each other during and prior to patient examinations, Plaintiff has not shown that this failure on the County's part caused Dixon's discharge.

The undisputed evidence also shows that the CT scan Dixon had on the morning of January 2 was available that afternoon (after Dixon had been discharged) and revealed that the mass in his chest had grown and was malignant. Although Plaintiff does not specifically make the argument, the Court construes Plaintiff's complaint and briefs to contend that County medical professionals should have compared the CT scans from December 11 and January 2 and realized that Dixon needed to be transferred back from the jail again and checked into the hospital to receive palliative care.

Plaintiff, however, does not provide any evidence that any deficient County policies or practices caused Dixon to be deprived of palliative care until January 5. Plaintiff has provided some evidence that the County's policies and practices for maintaining medical records and ensuring coordination among medical professionals were deficient. For instance, Dr. Cruz testified that he did not always have the medical records he required when examining patients, and Dr. Bonaparte testified that Dixon's December 11 CT scan was not in the files she had when she

examined him. But Plaintiff has presented no evidence to show that this type of policy break down caused Dixon's harm in this specific instance. For there to have been a policy break-down sufficient to support a claim that the County was deliberately indifferent, Plaintiff needed to allege and provide evidence that a medical professional with the authority to order that Dixon be readmitted to the hospital was *prevented* from reviewing Dixon's January 2 CT scan. Plaintiff has made no such allegation or presented any such evidence. Without such evidence, there is no basis to infer that the reason Dixon was allowed to remain in the jail was anything other than a decision by the medical professionals who reviewed his records.[5]

Therefore, Plaintiff's claim against the County must be dismissed because a reasonable juror could not find that the harm Dixon suffered was caused by any deficiencies that may have existed in the County's policies for making medical records available to treating medical professionals or ensuring that medical professional adequately communicated with each other.

---

[5] Plaintiff, of course, also relies on the report from the Department of Justice, while the County argues that this report is inadmissible hearsay. The Court need not decide whether the report is admissible since the Court had held that Plaintiff has failed to produce any evidence of a sufficient causal relationship between the County's policies (or lack thereof) and the failure to provide palliative care to Dixon between January 2 and January 5.

**Conclusion**

For the foregoing reasons, both the County's motion for summary judgment, R. 106, and the Officers' motion for summary judgment, R. 119, are granted, and Plaintiff's complaint is dismissed.

ENTERED

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: October 30, 2013